UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL No.
12-10120-GAO

UNITED STATES OF AMERICA

v.

EDGAR ACEVEDO, JULIO GONZALEZ
DEBORAH TORRES and WILLIAM AYALA

**MEMORANDUM OF DECISION AND ORDER**
**ON GOVERNMENT'S MOTION TO COMPEL**

March 28, 2014

DEIN, M.J.

## I. INTRODUCTION

This matter is before the court on the "Government's Motion to Compel Production of Buccal Swabs for Confirmatory DNA Testing and Major Case Fingerprints" (Docket No. 267). Pursuant to this motion, the Government has requested that this court order defendants Julio Gonzalez, Deborah Torres and William Ayala to provide samples of their DNA through the use of buccal swabs. The Government has also requested that this court order defendants Edgar Acevedo, Gonzalez, Torres and Ayala to provide "major case" fingerprints, which includes, without limitation, fingerprinting of the palm and extreme sides of the joints, tips and sides of the fingers, in addition to those fingertip portions normally included in standard fingerprinting, as determined by

the examiner taking the prints. After consideration of the pleadings and argument of counsel, the Motion to Compel is ALLOWED.[1]

## II. BACKGROUND

The parties are very familiar with the facts of this case, and there have been numerous hearings before this court, including several hearings relating to the issue of pre-trial detention, which involved the presentation of evidence concerning the alleged crimes which form the basis of the indictment. Therefore, this recitation of facts will be limited to those needed to put this court's ruling in context.

The indictment arises out the alleged kidnapping of the victim at gunpoint from his father-in-law's car while they were driving in Boston on January 30, 2012. It is alleged that the kidnappers forced the victim out of the car and into a van, which drove away. The victim's father-in-law's attempt to follow the van was thwarted by another car with a female driver who cut him off. The kidnappers used the victim's cell phone to contact the victim's wife, who eventually agreed to pay a ransom. Unbeknownst to the kidnappers, the FBI became involved shortly after the kidnapping, and coated the ransom money and the bag in which it was stored with florescent powder that glowed when exposed to ultraviolet light.

The FBI conducted surveillance of the delivery of the ransom (it was dropped into the back of a pick-up truck), and its collection by the kidnappers, as well as over the events that transpired following the delivery of the ransom. In particular, but

---

[1] Since William Ayala pleaded guilty on March 25, 2014 to conspiracy to commit kidnapping, this court assumes that the motion is moot as to him and he will not be discussed further.

without limitation, the agents observed the truck into which the ransom money had been delivered travel to 464 High Street in Lawrence, where the defendant Alfred Vazquez lived.[2] The agents went into Vazquez's apartment, where they saw the ransom bag on the floor. Both the bag and Vazquez's hands glowed with a light green color emitted by the fingerprint powder when viewed under an ultraviolet light. The defendant Acevedo was arrested when he emerged from an upstairs apartment. His hands, too, glowed with the same green color when viewed under an ultraviolet light.

The agents learned that Vazquez had formerly resided at 152 Farnham Street. When they went to that location, they found the victim. The agents also seized cigarette butts and a drinking straw.

Three cooperating witnesses (CW-1, CW-2 and CW-3) were eventually identified by the FBI. They have identified Acevedo, Gonzalez, Torres and Ayala as members of the kidnapping crew who were at 152 Farnham Street at various points while the victim was being held there. In addition, fingerprints of Gonzalez and Ayala have been found on duct tape and other items found at 152 Farnham Street, although the defendants challenge the strength of the identifications. The FBI analyst has also detected several other latent fingerprints, palm prints and other impressions that could be suitable for comparison.

The Government describes the status of existing DNA evidence as follows:

> Alan Giusti, an analyst with the FBI's Nuclear DNA Unit, concluded that DNA extracted from a drinking straw at 152 Farnham Street appeared to match a DNA profile for Ayala contributed after he was

---

[2] Vazquez pleaded guilty on May 8, 2013 to conspiracy to commit kidnapping.

> convicted of a felony offense in Puerto Rico. When Gonzalez and Torres were arrested, agents obtained a buccal swab from them and their DNA profiles were contributed to CODIS. Giusti concluded that DNA from two cigarette butts found at 152 Farnham Street appeared to match the DNA from the arrest buccal swabs of Torres and Gonzalez. Giusti noted that CODIS results are not "suitable for use in criminal proceedings" and advised that the "FBI laboratory will perform the necessary direct forensic comparison to support this investigative lead upon receipt of a known blood sample or buccal swab" from Ayala, Gonzalez, and Torres.

(Gov't Mot. (Docket No. 267) at 4). The defendants, most strenuously Gonzalez, argue that the Government has overstated the level of matching reported by the FBI's analyst.

Additional facts will be provided below where appropriate.

### III. "MAJOR CASE" FINGERPRINTS

The Government is seeking to obtain "major case" fingerprints from Acevedo, Gonzalez and Torres. Acevedo objects on the grounds that his fingerprints were already taken. He argues that the request is untimely in light of the fact that he has been under arrest since February 4, 2012, the Government has consistently taken the position that his fingerprints have not been identified on any item, and there is a risk that the request will delay the trial in this case. (See Docket No. 276). While Gonzalez has filed an opposition, which is entitled an opposition to the request for DNA and major case fingerprints (Docket No. 277), he does not oppose the fingerprint request but rather focuses his opposition on the Government's request for DNA samples. (See Docket No. 277). Torres, on the other hand, opposes the Government's request for major case fingerprints, arguing that "there has been no showing that any of Torres's fingerprints in the government's possession from her booking have matched any latent

fingerprints recovered from specific evidence in the case warranting a further request for additional 'major case' fingerprints." (Docket No. 275 at 1). For the reasons detailed herein, the request for major case fingerprints will be allowed.

It is well established that "[a] defendant may be ordered to submit to the taking of fingerprints" as well as of palm prints. United States v. Pakala, 329 F. Supp. 2d 178, 180 (D. Mass. 2004) (citing United States v. Kloepper, 725 F. Supp. 638 (D. Mass. 1989)). Since, however, requiring a defendant to provide fingerprints or palm prints may implicate the Fourth Amendment right to be free from unreasonable searches, the Government must establish that there is probable cause to believe that the defendants' fingerprints will be found at the crime scene. See id. at 180-81. The Government has met this burden.

Based on the record before this court, three cooperating witnesses have placed the four defendants at the scene where the victim was found, and from which items were taken that contained latent fingerprints. The victim was located at the Farnham Street address for several days, and members of the kidnaping crew visited there on multiple occasions. Thus, there is probable cause to believe that these individuals were present at that location. The fact that fingerprints from Acevedo and Torres have not been previously located does not alter this conclusion. Rather, as the Government argues, "[o]btaining major case prints from Acevedo, Gonzalez, Torres, and Ayala will enable the fingerprint examiner to make direct comparisons of their fingerprints to the evidence seized and may enable her to identify other latent impressions." (Gov't Mot. at 5).

This court is cognizant of the fact that Acevedo has been incarcerated for a lengthy period of time pre-trial, a situation which has occurred primarily because additional individuals were indicted in a superceding indictment shortly before he was to go to trial.[3] This court also recognizes that the case has proceeded with the defendant's understanding that no fingerprints have been identified as being his. However, the evidence before this court is that there is evidence through ultra-violet testing that Acevedo handled either the ransom money or the bag in which the money was stored. Thus, the Government's contention that fingerprints may be located at places associated with the kidnapping should not be a surprise to him. Moreover, the allowance of this additional fingerprinting should have no affect on the trial. The trial is being scheduled independently of this motion, and is not dependent on whether the fingerprinting analysis is completed or not. Finally, the defendants have cited to no requirement that the Government's investigation be completed at a specific time prior to trial. Under these circumstances, therefore, the government's motion to obtain "major case" fingerprints is allowed.

## IV. DNA SAMPLES

---

[3] On March 6, 2012, Acevedo consented to pre-trial detention after several days of hearings. (Docket No. 10). He later requested that this court reopen this issue, and this court heard argument in connection with Acevedo's motion for pre-trial release on December 6, 2013. (Docket No. 240). However, he subsequently requested that the court defer ruling on the motion until further notice. (Docket Nos. 251, 255).

The Government is seeking to obtain additional buccal swabs from Gonzalez and Torres.[4] Gonzalez contends that there is no probable cause to believe that a buccal swab will yield evidence that he participated in the crime. (Docket No. 277 at 5). This argument is premised primarily on an analysis of the DNA testing done to date, which Gonzalez argues does not conclusively establish that the DNA run through CODIS was his. (Id. at 5-8). In addition, Gonzalez argues that the fact that the three cooperating witnesses placed him at the scene of the kidnapping does not provide probable cause that further DNA testing would be productive "in the face of vaguely described and apparently inconclusive results produced by the CODIS search." (Id. at 9). Thus, Gonzalez argues that if the Government's motion is not denied, a ruling on the motion should be deferred until the Government provides additional documentation regarding the CODIS testing done to date, and the defendant has the opportunity to analyze the information and further oppose the request based on the inconclusiveness of the testing done to date. Torres also opposes the Government's request, albeit on a different ground. Torres argues that under Maryland v. King, 133 S. Ct. 1958 (2013), the Government was limited to using the prior DNA sample in order to identify the defendant only, and it was misused to obtain incriminating evidence from the scene. According to Torres, "[t]his misconduct requires exclusion of the results of that comparison and any additional request for comparison DNA samples based on the

---

[4] A buccal swab has been described as a "far more gentle process than a venipuncture to draw blood. It involves but a light touch on the inside of the cheek[.]" Maryland v. King, 133 S. Ct. 1958, 1969 (2013) (citation omitted).

results of that improper testing would be tainted by the previous impropriety." (Docket No. 275 at 3). This court finds these arguments unpersuasive.

It has recently been established by the Supreme Court "that the *taking* of a DNA sample from an arrestee using a buccal swab on the inside of a person's cheek is a search." United States v. Thomas, 736 F.3d 54, 60 (1st Cir. 2013) (citing Maryland v. King, 133 S. Ct. 1958, 1968-69 (2013)). Specifically, in Maryland v. King, a divided Supreme Court upheld the collection and analysis of a DNA sample from persons arrested, but not yet convicted, on felony charges. See Maryland v. King, 133 S. Ct. at 1965-66. As the Court held:

> In light of the context of a valid arrest supported by probable cause respondent's expectations of privacy were not offended by the minor intrusion of a brief swab of his cheeks. By contrast, that same context of arrest gives rise to significant state interests in identifying respondent not only so that the proper name can be attached to his charges but also so that the criminal justice system can make informed decisions concerning pretrial custody. Upon these considerations the Court concludes that DNA identification of arrestees is a reasonable search that can be considered part of a routine booking procedure. When officers make an arrest supported by probable cause to hold for a serious offense and they bring the suspect to the station to be detained in custody, taking and analyzing a cheek swab of the arrestee's DNA is, like fingerprinting and photographing, a legitimate police booking procedure that is reasonable under the Fourth Amendment.

Id. at 1980. Once the DNA sample is lawfully taken, the FBI creates a genetic profile of the individual which is then entered into "CODIS," the FBI's Combined DNA Index System. See United States v. Weikert, 504 F.3d 1, 3-4 (1st Cir. 2007). As the First Circuit has explained, CODIS is

> a massive, centrally managed database including DNA profiles from federal, state, and territorial DNA collection programs, as well

> as profiles drawn from crime-scene evidence, unidentified remains, and genetic samples voluntarily provided by relatives of missing persons.
>
> ...
>
> CODIS is a valuable law enforcement tool. It may be used to match evidence found at one crime scene with evidence found at another crime scene, revealing a common perpetrator. It also may be used to match evidence from the scene of a crime to a particular offender's profile. These attributes allow the FBI to investigate crimes more efficiently and more accurately, both by identifying offenders and by eliminating innocent suspects.

Id. at 4.

Based on this description, it is unclear in what way Torres contends the FBI "misused" the DNA sample it obtained at the time of her arrest. In any event, Torres' argument may be addressed in connection with any motion to suppress she may want to file. For present purposes, what is relevant is the fact that just because a buccal swab was taken at the time of arrest does not preclude another sample. See Maryland v. King, 133 S. Ct. at 1965 (following the initial identification of King through CODIS as the perpetrator of the rape, additional DNA testing of King was performed to link King to the rape).

As the Government has recognized, the First Circuit has not expressly ruled whether it must have probable cause or just a reasonable suspicion that the DNA from the buccal swab "will match DNA extracted from items seized at 152 Farnham Street." (Gov't Mem. at 8-9 (citing United States v. Noble, 433 F. Supp. 2d 129, 135 & n.4 (D. Me. 2006) (collecting cases); Commonwealth v. Maxwell, 441 Mass. 773, 778-79, 808 N.E.2d 806, 811 (2004))). This issue does not need to be decided here, since, as the Government argues, it has met its burden under a probable cause standard.

Gonzalez has asked this court to allow a battle of the experts regarding the level of identification established by the CODIS analysis before finding that there is probable cause to allow another buccal swab. This court declines to do so. Gonzalez has cited no cases, and none have been found, limiting a second buccal swab to situations where the initial CODIS information conclusively established a DNA match. Rather, the case law establishes that it is not the CODIS match, but the more extensive subsequent DNA analysis that is appropriately presented at trial. See, e.g., Maryland v. King, 133 S. Ct. at 1965 (while DNA information in CODIS system used to identify King as rapist, additional DNA samples were taken and used at the actual trial); Nock v. Roden, No. 10-10158-RGS, 2011 WL 679845, at *11 (D. Mass. Jan. 31, 2011) (Boal, M.J.) ("The substantive evidence used to establish Nock as the perpetrator of the charged crimes was not based on the CODIS match but on a direct comparison Cellmark performed of Nock's court-ordered DNA sample with specimens from the victim and crime scene."), aff'd, 2011 WL 675042 (Feb. 18, 2011); United States v. Johnson, No. 1:11CR1, 2011 WL 4729966, at *1 (N.D. Ohio Oct. 7, 2011) (another DNA sample obtained after CODIS profile of defendant "could not be excluded as a potential match to the DNA on the hat" worn by the perpetrator).

In the instant case, at a minimum, the CODIS profiles of Gonzalez and Torres do not rule them out as potential matches to the DNA found at the crime scene. In fact, they affirmatively identified them as a potential match, albeit their conclusiveness is open to challenge. More significantly, however, given that three cooperating witnesses placed Gonzalez and Torres at the crime scene, and Gonzalez's fingerprints were

found at the scene, this court agrees with the Government that "the government had probable cause to petition the Court to obtain a sample of their DNA even without the investigative leads generated by CODIS."  (Gov't Mem. at 9).

## V. CONCLUSION

For all the reasons detailed herein, the "Government's Motion to Compel Production of Buccal Swabs for Confirmatory DNA Testing and Major Case Fingerprints" (Docket No. 267) is ALLOWED.

                                            / s / Judith Gail Dein
                                            JUDITH GAIL DEIN
                                            UNITED STATES MAGISTRATE JUDGE